UNITED STATES DISTRICT COURT<br>FOR THE DISTRICT OF KANSAS

**WILLIAM L WRIGHT,**

**Plaintiff,**

**v.**                                                     **Case No. 15-1268-EFM**

**ENHANCED RECOVERY COMPANY, LLC**

**Defendant.**

_____

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT ENHANCED RECOVERY COMPANY, LLC'S MOTION FOR SUMMARY JUDGMENT

Plaintiff William Wright, by and through his undersigned counsel A. Scott Waddell of the Waddell Law Firm LLC, and pursuant to FRCP 56 and Local Rule 56.1(b), hereby offers his Memorandum in Opposition to Defendant Enhanced Recovery Company, LLC's Motion for Summary Judgment.

## I.  PLAINTIFF'S RESPONSE TO DEFENDANT S STATEMENT OF FACTS

1.   Admitted/Uncontroverted.

2.   Admitted/Uncontroverted.

3.   Admitted/Uncontroverted.

4.   Admitted/Uncontroverted.

5.   Admitted/Uncontroverted.

6.   Admitted/Uncontroverted.

7.   Admitted/Uncontroverted.

8.   Admitted/Uncontroverted.

9.    Admitted/Uncontroverted.

10.   Admitted/Uncontroverted.

11.   Admitted/Uncontroverted.

12.   Admitted/Uncontroverted.

13.   Admitted/Uncontroverted.

14.   Admitted/Uncontroverted.

15.   Admitted/Uncontroverted.

16.   Admitted/Uncontroverted.

17.   Two calls ERC placed to the 4969 Number were connected and a pre-recorded voice message played, which asked the recipient to confirm whether or not he or she was the sought party and allowed the recipient to interact using the telephone keypad.

**DENIED/CONTROVERTED.  Defendant's corporate designee testified that Defendant made at least seven collection calls to Plaintiff via use of an autodialer. *See* Exhibit 5, Deposition of Jason Davis, page 6, line 24 through page, 7, line 25.  At a minimum, Defendant's auto-dialed calls included calls to Plaintiff on July 23 and 30, 2014; August 1, 6, 8, and 20, 2014; and December 10, 2014. *See* Exhibit 5, Deposition of Jason Davis, page 6, line 24 through page, 7, line 25.**

18.   The first call occurred on July 30, 2014 and the recipient selected the options indicating that he is not the called party and that the called party is not presently available.

**DENIED/CONTROVERTED.** Each time Plaintiff received a collection call from Defendant Plaintiff explained that they had called a wrong number and that they remove Plaintiff's phone number from Defendant's records and be placed on their do-not-call list. *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 16, lines 10-14. Plaintiff spoke to a human being employee of Defendant approximately a dozen times and during these calls asked Defendant to change their records and remove Plaintiff's phone number from their dialing list. *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 16, line 11 through page 17, line 10. When Plaintiff requested that Defendant change their records and remove Plaintiff's phone number from their dialing list, "90 percent of the time they [Defendant's employees and/or agents] said they were going to change their records." *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 17, lines 12-13. These phone conversations between Plaintiff and Defendant where Plaintiff asked Defendant to change their records and remove Plaintiff's phone number from their dialing list lasted "usually less than two minutes." *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 17, lines 14-15.

19. There is a second option, not selected on that call, which indicates the called number is a wrong number.

**DENIED/CONTROVERTED.** Each time Plaintiff received a collection call from Defendant Plaintiff explained that they had called a wrong number and

that they remove Plaintiff's phone number from Defendant's records and be placed on their do-not-call list. *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 16, lines 10-14. Plaintiff spoke to a human being employee of Defendant approximately a dozen times and during these calls asked Defendant to change their records and remove Plaintiff's phone number from their dialing list. *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 16, line 11 through page 17, line 10. When Plaintiff requested that Defendant change their records and remove Plaintiff's phone number from their dialing list, "90 percent of the time they [Defendant's employees and/or agents] said they were going to change their records." *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 17, lines 12-13. These phone conversations between Plaintiff and Defendant where Plaintiff asked Defendant to change their records and remove Plaintiff's phone number from their dialing list lasted "usually less than two minutes." *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 17, lines 14-15.

20. The second call connected on December 10, 2014, and ERC's pre-recorded voice message played without any interaction from the call recipient.

**DENIED/CONTROVERTED. Each time Plaintiff received a collection call from Defendant Plaintiff explained that they had called a wrong number and that they remove Plaintiff's phone number from Defendant's records and be placed on their do-not-call list. *See* Plaintiff's Exhibit 4, Deposition of**

**Plaintiff William Wright, page 16, lines 10-14. Plaintiff spoke to a human being employee of Defendant approximately a dozen times and during these calls asked Defendant to change their records and remove Plaintiff's phone number from their dialing list.** *See* **Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 16, line 11 through page 17, line 10. When Plaintiff requested that Defendant change their records and remove Plaintiff's phone number from their dialing list, "90 percent of the time they [Defendant's employees and/or agents] said they were going to change their records."** *See* **Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 17, lines 12-13. These phone conversations between Plaintiff and Defendant where Plaintiff asked Defendant to change their records and remove Plaintiff's phone number from their dialing list lasted "usually less than two minutes."** *See* **Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 17, lines 14-15.**

21.    ERC's records reflect that there was never a call to the 4969 Number which connected the call recipient to a live representative.

**Admitted/Uncontroverted to the extent of what "ERC's records reflect". However, each time Plaintiff received a collection call from Defendant Plaintiff explained that they had called a wrong number and that they remove Plaintiff's phone number from Defendant's records and be placed on their do-not-call list.** *See* **Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 16, lines 10-14. Plaintiff spoke to a human being employee of**

Defendant approximately a dozen times and during these calls asked Defendant to change their records and remove Plaintiff's phone number from their dialing list. *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 16, line 11 through page 17, line 10. When Plaintiff requested that Defendant change their records and remove Plaintiff's phone number from their dialing list, "90 percent of the time they [Defendant's employees and/or agents] said they were going to change their records." *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 17, lines 12-13. These phone conversations between Plaintiff and Defendant where Plaintiff asked Defendant to change their records and remove Plaintiff's phone number from their dialing list lasted "usually less than two minutes." *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 17, lines 14-15.

22.     Admitted/Uncontroverted.

23.     Admitted/Uncontroverted.

24.     Admitted/Uncontroverted.

25.     Admitted/Uncontroverted.

26.     Admitted/Uncontroverted.

27.     Admitted/Uncontroverted.

28.     Admitted/Uncontroverted.

29.     Admitted/Uncontroverted.

30.     Admitted/Uncontroverted.

31.     Admitted/Uncontroverted.

32.     Admitted/Uncontroverted.

33.     Admitted/Uncontroverted.

34.     Admitted/Uncontroverted.

35.     Admitted/Uncontroverted.

36.     Admitted/Uncontroverted.

37.     Admitted/Uncontroverted.

38.     Admitted/Uncontroverted.

39.     Admitted/Uncontroverted.

40.     Admitted/Uncontroverted.

41.     Admitted/Uncontroverted.

42.     Admitted/Uncontroverted.

43.     Plaintiff has identified only two specific calls during which he claims to have informed ERC's representatives it was calling the wrong number.

**DENIED/CONTROVERTED.  Each time Plaintiff received a collection call from Defendant Plaintiff explained that they had called a wrong number and that they remove Plaintiff's phone number from Defendant's records and be placed on their do-not-call list.** *See* **Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 16, lines 10-14.  Plaintiff spoke to a human being employee of Defendant approximately a dozen times and during these calls asked Defendant to change their records and remove Plaintiff's phone number from their dialing list.** *See* **Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 16, line 11 through page 17, line 10.  When**

**Plaintiff requested that Defendant change their records and remove Plaintiff's phone number from their dialing list, "90 percent of the time they [Defendant's employees and/or agents] said they were going to change their records."** *See* **Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 17, lines 12-13. These phone conversations between Plaintiff and Defendant where Plaintiff asked Defendant to change their records and remove Plaintiff's phone number from their dialing list lasted "usually less than two minutes."** *See* **Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 17, lines 14-15.**

44.     Admitted/Uncontroverted.

45.     Admitted/Uncontroverted.

46.     Admitted/Uncontroverted.

47.     Admitted/Uncontroverted.

48.     Admitted/Uncontroverted.

49.     Admitted/Uncontroverted.

51.     Admitted/Uncontroverted.

52.     Admitted/Uncontroverted.

53.     Admitted/Uncontroverted.

**II.     PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS**

54.     Defendant Enhanced Recovery Company LLC is listed on the State of Texas' Directory of Automatic Dial Announcing Devices. *See* Plaintiff's Exhibit 1, Directory of Automatic Dial Announcing Devices and Plaintiff's

Exhibit 2, Public Utility Commission of Texas ADAD Report for Enhanced Recovery Company LLC.

55.     Defendant Enhanced Recovery Company LLC has had its Automatic Dial Announcing Devices Permit since June 29, 2012 through June 29, 2016. *See* Plaintiff's Exhibit 2, Public Utility Commission of Texas ADAD Report for Enhanced Recovery Company LLC.

56.     Plaintiff's 4969 phone number has been on the National Do Not Call Registry since January 15, 2008. *See* Plaintiff's Exhibit 3, National Do Not Call Registry Confirmation.

57.     Plaintiff is permanently disabled as he suffers from end-stage renal disease. *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 7, lines 12-25.

58.     Plaintiff's end-stage renal disease prevents him from working. *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 7, lines 24-25.

59.     Plaintiff attends dialysis three times per week on a nocturnal schedule. *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 11, lines 7-10.

60.     Plaintiff is sixty-four years of age, born June 16, 1952. *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 5, lines 21-22.

61.     Plaintiff's permanent disability substantially limits one or more of his major life activities including his ability to work. *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 7, lines 24-25.

62. Each time Plaintiff received a collection call from Defendant Plaintiff explained that they had called a wrong number and that they remove Plaintiff's phone number from Defendant's records and be placed on their do-not-call list. *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 16, lines 10-14.

63. Plaintiff spoke to a human being employee of Defendant approximately a dozen times and during these calls asked Defendant to change their records and remove Plaintiff's phone number from their dialing list. *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 16, line 11 through page 17, line 10.

64. When Plaintiff requested that Defendant change their records and remove Plaintiff's phone number from their dialing list, "90 percent of the time they [Defendant's employees and/or agents] said they were going to change their records." *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 17, lines 12-13.

65. These phone conversations between Plaintiff and Defendant where Plaintiff asked Defendant to change their records and remove Plaintiff's phone number from their dialing list lasted "usually less than two minutes." *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 17, lines 14-15.

66. During some of the calls from Defendant to Plaintiff representatives of Defendant were rude to Plaintiff. *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 18, lines 2-4.

67.     During the calls made by Defendant's IVR system, Plaintiff selected the option to identify as not being Stephanie Yokom. *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 21, lines 10-11.

68.     Plaintiff started maintaining a call log "because of the frequency of calls for Stephanie Yokom from ERC." *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 22, lines 9-11.

69.     The frequency of calls to Plaintiff for Stephanie Yokom or Stephanie Elkins increased in 2013. *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 24, line 3.

70.     Plaintiff received twenty-one collection calls from Defendant. *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 43, line 18 through page 44, line 11; *See* Exhibit 5, Deposition of Jason Davis, page 6, line 24 through page,11, lines 10-14.

71.     Plaintiff alerted ERC and/or human representatives of ERC numerous times that he was not to be called, that he was not Stephanie Yokom and that he did not know who Stephanie Yokum was. *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 70, lines 4-10.

72.     Despite Plaintiff's pleas to ERC and/or human representatives of ERC numerous times that Plaintiff was not to be called again, ERC continued to place calls to Defendant. *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 70, lines 4-17.

73.     The reason Plaintiff sued ERC rather than the other purported debt

collectors calling Plaintiff instead of Stephanie Yokum is because the other debt collectors actually quit calling Plaintiff upon Plaintiff's request to quit being called. *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 70, lines 14-19.

74.     In every call from ERC where there was a human being on the line or a notation of Stephanie Elkins or Stephanie Yokum, Plaintiff informed ERC that they had the wrong number, to please change their records and take Plaintiff's number off ERC's list of people to contact. *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 71, lines 13-24.

75.     All of Defendant's calls to Plaintiff were after Plaintiff was 60 years of age. *See* Plaintiff's Exhibit 4, Deposition of Plaintiff William Wright, page 5, lines 21-22; *See also* Exhibit 5, Deposition of Jason Davis, page 6, line 24 through page, 7, line 25.

76.     Defendant's corporate designee testified that Defendant made at least seven collection calls to Plaintiff via use of an autodialer. *See* Exhibit 5, Deposition of Jason Davis, page 6, line 24 through page, 7, line 25.

77.     At a minimum, Defendant's auto-dialed calls included calls to Plaintiff on July 23 and 30, 2014; August 1, 6, 8, and 20, 2014; and December 10, 2014. *See* Exhibit 5, Deposition of Jason Davis, page 6, line 24 through page, 7, line 25.

78.     Defendant's corporate designee Jason Davis testified and acknowledged that there is a fact issue for a jury to determine regarding whether

or not Plaintiff ever spoke to a human being employed by ERC. *See* Exhibit 5, Deposition of Jason Davis, page 20, line 21 through page 21, line 6.

79. On July 8, 2015, Plaintiff's counsel sent Defendant a *Nelson v. Miller* letter containing Plaintiff's factual allegations and a settlement demand. See Exhibit 6, copy of same.

80. Defendant received Plaintiff's July 8, 2015 *Nelson v. Miller* letter on July 10, 2015. *See* Exhibit 7, History of Account, page 2 of 2 ("REC LEGAL BMA>>>PRE-SUIT>>>WILL REV").

81. Defendant finally added Plaintiff's 4969 phone number to the Do Not Call List after years of calling Plaintiff on July 10, 2015. *See* Exhibit 7, History of Account, page 2 of 2 ("ADDED PHONE NUMBER 3166804969 TO THE DNC LIST").

82. Defendant did not dispute Plaintiff's factual allegations or even respond to the aforementioned *Nelson v. Miller* letter with any settlement offer prior to being served with this lawsuit. *See* Exhibit 8, Declaration of A. Scott Waddell.

## III. LEGAL STANDARD

A party seeking summary judgment carries the burden of showing the "absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc*. 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If "the moving party has met its burden, the

burden shifts to the nonmoving party to show that there is a genuine issue of material fact." *Bacchus Indus.*, 939 F.2d at 891.

"In asserting motions for summary judgment, both trial and appellate courts must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues." *Id.* In determining whether there exists a genuine issue of material fact, "if an inference can be deducted from the facts whereby the non-movant could recover, summary judgment is inappropriate." *Smith v. Atlantic Richfield Co.*, 814 F.2d 1481, 1488 (10th Cir. 1987).

> Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences form the facts <u>are jury functions, not those of a judge,</u> whether he is ruling on a motion for summary judgment or for a directed verdict. <u>The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor</u>.

*Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added).

When a defendant moves for summary judgment, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2512.

> It is only where it is perfectly clear that there are no issues in the case that a summary judgment is proper. Even in cases where the judge is of opinion that he will have to direct a verdict for one party or the other on the issues that have been raised, he should ordinarily hear the evidence and direct the verdict rather than attempt to try the case in advance on a motion for summary judgment, which was never intended to enable the parties to evade jury trials or have the judge weigh evidence in advance of its being presented.

*Pierce v. Ford Motor Co.*, 190 F.2d 910, 915-916 (4th Cir. 1951).

Since the evidence of the nonmoving party is deemed true and all reasonable inferences are drawn in his favor, the nonmoving party "need only present evidence from which a jury might return a verdict in his favor." *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505. "Where different, ultimate inferences may be drawn from the evidence presented by the parties, the case is not appropriate for summary judgment." *Dayton Hudson Corp. v. Macerich Real Estate Co*., 812 F.2d 1319, 1322-23 (10th Cir. 1987). Likewise, any action examined under Rule 56, that raises real issues of credibility, motive or intent is not suitable for summary judgment, whatever the nature of the case may be. *Baum v. Gillman*, 648 F.2d 1292, 1296 (10th Cir. 1981).

## IV.    ARGUMENT AND AUTHORITIES

### A.    Plaintiff's KCPA claims

The Kansas Consumer Protection Act ("KCPA") shall be liberally construed. K.S.A. § 50-623. "Supplier" under the KCPA includes a "person" who "**enforces consumer transactions, whether or not dealing directly with the consumer**". Defendant is such an enforcer of consumer transactions and person. K.S.A. § 50-624(l), (*emphasis supplied*).

The KCPA provides that "[n]o supplier shall engage in any deceptive act or practice **in connection with a consumer transaction**." K.S.A. § 50-626(a), (*emphasis supplied*). The KCPA further restricts suppliers from engaging "in any unconscionable act or practice **in connection with a consumer transaction**." K.S.A. § 50-627(a) (*emphasis supplied*). This case surrounds the deceptive and

unconscionable acts engaged in by Defendants in their **attempts** to enforce a consumer transaction from Plaintiff – even though Plaintiff was never privy to the underlying alleged debt at issue.

When adjudicating whether or not an individual was "aggrieved" and thus had standing to bring suit under the KCPA for deceptive and/or unconscionable conduct, the Kansas Supreme Court previously held that: "**A party is aggrieved whose legal right is invaded by an act complained of** or whose pecuniary interest is directly affected by the order. The terms refers to substantial grievance, a denial of some property right, **or the imposition upon a party of some burden or obligation**." *Lowe v. Surpas Resource Corp.*, 253 F. Supp.2d 1209 (*quoting Petition of Kansas City*, 190 Kan. 308, 374 P.2d 35 (1962), (*emphasis supplied*). In *Ellibee v. Aramark Correctional Services, Inc.*, also a KCPA case, the Kansas Court of Appeals identified "three relevant inquiries to be made in determining consumer status: (1) to whom were the representations made; (2) who suffered the damages; and (3) who was affected by the defendant's alleged misconduct." 154 P.3d 39, *41 (Kan. App. 2007). Certainly, Plaintiff satisfies these thresholds.

The KCPA specifically provides that "[a]n unconscionable act or practice violates this act whether it occurs before, during or **after the transaction**." *See* K.S.A. § 50-627 (a), (*emphasis supplied*). Further, the Kansas Supreme Court has previously held that debt collection activities are subject to the provisions of the KCPA when the conduct complained of, either deceptive or unconscionable, occurred during the collection of, **or an attempt to collect** a debt which arose

from a consumer transaction and was owed to the original supplier. *State ex rel. Miller v. Midwest Serv. Bur. of Topeka, Inc.*, 229 Kan. 322, 329, 623 P.2d 1343, 1349 (1981) (*emphasis added*). This holding specifically stated the KCPA applies if:

(1) The debt sought to be enforced came into being as a result of the consumer transaction;

(2) The parties to the original consumer transaction were a "supplier" and a "consumer" as defined by the act; and

(3) The conduct complained of, either deceptive or unconscionable, occurred during the collection of, or an attempt to collect, a debt which arose from the consumer transaction and was owed to the original supplier.

*State ex rel. Miller v. Midwest Serv. Bur. of Topeka, Inc.*, 229 Kan. 322, 329, 623 P.2d 1343, 1349 (1981).

Nothing in the *Miller* holding requires that the claimant/litigant be the original consumer, only that the parties to the original consumer transaction were a "supplier" and a "consumer". All of these requirements are satisfied and were pled with sufficient particularity within Plaintiff's Petition.

Finally, Defendant only gives cursory attention to the material changes to the KCPA in 2014. Specifically, the KCPA was amended in 2014 to include new claims falling under the Kansas No-Call Act, KSA §§ 50-670, 50-670a, and 50-671. First, the Kansas No-Call Act specifically "shall be part of and supplemental to the Kansas consumer protection act." KSA § 50-670 (h). The Kansas No-Call Act requires that the caller or user of an auto-dialer consult the no-call list and delete from the calling list all telephone numbers appearing on such list. KSA §

50-670a (a).  The Kansas No-Call Act prohibits any calls to any telephone number appearing on the no-call list.  KSA § 50-670a (b).  Plaintiff's 4969 phone number has been on the National Do Not Call Registry since January 15, 2008.  "The national no-call list established and maintained by the federal trade commission shall be designated as the Kansas no-call list."  KSA § 50-670a (l).  It is uncontroverted that Defendant called Plaintiff at least twenty-one times while Plaintiff's number was on the National and Kansas no-call list.  Doing so each time was "an unconscionable act or practice under the Kansas consumer protection act".  KSA §§ 50-670)(g) and 50-670a(n).

Defendant, for the first time in this litigation, has conceded that "it is undisputed each of Defendant's calls to the 4969 Number was placed in an attempt to collect an overdue financial obligation from a third-party and not in an attempt to solicit the sale of goods or services."  *See* Defendant's Motion for Summary Judgment, page 17.  The problem with Defendant's argument that the definition of ""Unsolicited consumer telephone call" excludes calls made "primarily in connection with an existing debt or contract, payment or performance which has not been completed at the time of such call" is that Plaintiff does not and did not owe Defendant, or any of Defendant's client or customers, anything.  Thus, there was never any "existing debt or contract" that would exempt Plaintiff from being protected under the Kansas No-Call Act.  Summary judgment should be denied.

**B.      Plaintiff's FDCPA Claims**

This case is almost identical to the *Morris v. Portfolio Recovery Associates, LLC* and *Jeter v. Alliance One Receivables Mgmt.* FDCPA cases in this District.[1] In denying a dispositive motion in *Morris*, Judge Carlos Murguia explained exactly why summary judgment should be denied and this case must go to a jury on Plaintiff's FDCPA claims:

> "The express purpose of the FDCPA is to eliminate abusive debt collection practices. *James v. Wadas*, 724 F.3d 1312, 1315 (10th Cir. 2013).   In particular, § 1692c(c) prohibits a debt collector from communicating with a consumer after the consumer requests in writing that the collector cease further communication. 15 U.S.C. § 1692c(c).   And the FDCPA defines "consumer" as any natural person obligated to pay a debt, *id.* § 1692a(3), which means that § 1692c(c) only protects debtors. *Morris v. Portfolio Recovery Associates, LLC*, No. 2:14-cv-02612, 2015 WL 4523855, *2 (D.Kan. July 27, 2015) (citing *Montgomery v. Huntington Bank*, 346 F.3d 693, 696-97 (6th Cir. 2003).
>
> Section 1692d, however, contains no such limitation. *Id.*   Section 1692d prohibits a debt collector from engaging in any conduct that the natural consequence of which is to harass, oppress or abuse "**any person**" in connection with the collection of a debt. 15 U.S.C. § 1692d.   It also specifically prohibits debt collectors from causing a telephone to ring repeatedly with the intent to annoy, abuse, or harass "any person" at the called number. *Id* § 1692d(5)." (*emphasis supplied*)."

---

[1] *Morris v. Portfolio Recovery Associates, LLC*, No. 2:14-cv-02612, 2015 WL 4523855,

Plaintiff has alleged that Defendant violated both §§ 1692d and 1692d(5) in this matter.[2] Continuing:

> "Defendant contends that plaintiff does not have a claim under § 1692c because he is not a consumer. In doing so, defendant attempts to create a standing issue by comparing plaintiff's actions to a section of the FDCPA intended to govern the debt collector's actions in relation to the debtor. But here, plaintiff is not the debtor, which makes § 1692c and § 1692c(c) both irrelevant. The relevant portion of the FDCPA— § 1692d—employs clear terminology that it is intended to govern the debt collector's actions in relation to "any person" in connection with the collection of a debt. The plain language of the statute indicates that § 1692d is the correct portion of the FDCPA for plaintiff's claim.
>
> Case law and the FDCPA's legislative history support this interpretation. One of the purposes of the FDCPA is that every person, including non-debtors, has a right to be treated in a reasonable manner. *Jeter v. Credit Bureau, Inc.,* 760 F.2d 1168, 1178 (11th Cir. 1985). With regard to a debt collector telephoning a non-debtor to collect a debt, courts have repeatedly allowed the non-debtor to file suit under § 1692d. *See, e.g., Meadow v. Franklin Collection Serv.,* 414 F. App'x 230 (11th Cir. 2011) (permitting claim under § 1692d of the FDCPA based on telephone calls to a non-

---

[2] " "28. Defendant violated the FDCPA through actions including but not limited to the following:
   (a)   Continuing to contact Plaintiff via Plaintiff's mobile phone despite Plaintiff previously requesting Defendant to cease and desist any further calls, in violation of § 1692d(5) and § 1692c(c); and
   (b)   engaging in conduct that had the natural consequence to harass, oppress and/or abuse Plaintiff in connection with the collection of a debt (15 U.S.C. § 1692d ); and"

debtor); *Jeter v. Alliance One Receivables Mgmt.*, No. 10-2024-JWL, 2010 WL 2025213, at *10 (D.Kan. May 20, 2010) (same)."

***

Furthermore, the legislature explicitly stated that the FDCPA was drafted with the intent to protect non-debtors and family members of the debtor." J*eter*, 2010 WL 2025213, at *10. As shown in the house report:

> **\*3** This bill also protects people who do not owe money at all. In the collector's zeal, collections effort[s] are often aimed at the wrong person either because of mistaken identity or mistaken facts. This bill will make collectors behave responsibly towards people with whom they deal. Another group of people who do not owe money, but who may be deliberately harassed are the family, employer and neighbors of the consumer. These people are also protected by this ... bill.

H.R.Rep. No. 131, 95th Cong. 1st Sess. 8." *Id.*

Disallowing plaintiff to bring suit under § 1692d would not only contradict case law, but it would also disregard the legislature's motive for drafting the bill. Congress intended to protect non-debtors like plaintiff by § 1692, and plaintiff properly filed her claim."

***

"Defendant's citations are not persuasive because courts have implicitly applied a less stringent standard for non-debtors to bring suit under the FDCPA than debtors. In *Meadows v. Franklin Collection Serv.,* a non-debtor brought suit under § 1692d for telephone calls received in connection with debt collection. 414 F. App'x 230, 231-32 (11th Cir. 2011). Even though the plaintiff received less than a call per day on average, the Eleventh Circuit denied the debt collector's motion for summary judgment. *See id.* at 233. Similarly, in *Jeter v. Alliance One Receivables Mgmt.,* a non-debtor filed § 1692d and § 1692d(5) claims in the District of Kansas. *Jeter*, 2010 WL 2025213, at *3. The plaintiff

alleged he was a non-debtor who received numerous phone calls from a debt collector. *Id.* Although the plaintiff advised the debt collector that he was not the debtor, the debt collector continued to call. *Id.* Furthermore, the plaintiff alleged that the defendant possessed electronic records of all calls made to the plaintiff. *Id.* at *14. The defendant filed a motion to dismiss. *Id.* at *1. In support of the motion, the defendant claimed that the plaintiff failed to sufficiently allege harassment or abuse. *Id.* at *15. The defendant noted that the plaintiff did not state the date of the first call, how many calls he received, the content of the calls, or an explanation of how the calls constituted harassment. *Id.* The court denied the motion to dismiss, because under the *Twombly* standard the plaintiff's allegations must only be specific enough to establish plausibility and fair notice. *Id.* at *15, *19. Detailed factual allegations are not required for a straightforward FDCPA claim. *Id.* at *17. Therefore, the court determined that the plaintiff's § 1692d claims sufficiently established plausibility and fair notice by alleging the defendant continued to call the plaintiff after being advised the plaintiff was not the debtor. *Id.* at *16.

**\*4** The factual allegations in *Jeter* are nearly identical to plaintiff's claim. Plaintiff is a non-debtor who received numerous calls from a debt collector. Plaintiff advised the debt collector that she was not the debtor, but the debt collector continued to call. Plaintiff also alleges that the debt collector possesses records of the calls. Similar to *Jeter,* plaintiff sufficiently linked her factual allegations to a straightforward FDCPA claim by alleging defendant continued to call plaintiff after being advised that plaintiff was not the debtor."

Defendant, for the first time in this litigation, has seemingly conceded that "it is undisputed each of Defendant's calls to the 4969 Number was placed in an

attempt to collect an overdue financial obligation from a third-party and not in an attempt to solicit the sale of goods or services." *See* Defendant's Motion for Summary Judgment, page 17. This concession in and of itself creates strict liability under the FDCPA and necessitates a jury trial of this matter. Defendant's Motion for Summary Judgment should be denied.

## C.    Plaintiff's TCPA claims

First, it is quite offensive that Defendant has the gall to argue and represent to this Court that "ERC did not use an automated telephone dialing system to place calls to the 4969 Number and it only used a pre-recorded voice message on two occasions."[3]    Before executing his sham Declaration, Defendant's corporate designee testified that Defendant made at least seven collection calls to Plaintiff via use of an auto-dialer. Further, Defendant's corporate designee testified that at a minimum Defendant's auto-dialed calls included calls to Plaintiff on July 23 and 30, 2014; August 1, 6, 8, and 20, 2014; and December 10, 2014.

Further, this Court may likely be interested that Defendant is registered in Texas as having an "Automatic Dial Announcing Device" ("ADAD"), which is required for "any individual or company wishing to make an unsolicited call using an ADAD". Defendant should be held liable for the statutory rights it violated, and Plaintiff's life, time, and privacy it invaded.

---

[3] *See* Defendant's Motion for Summary Judgment, page 26, first paragraph, first two lines.

Plaintiff filed this action against Defendant alleging that Defendant violated the TCPA by engaging the systematic practice of placing calls to consumers on their cellular phones, using auto dialer technology, without prior express consent.  Indeed, Defendant again acknowledges at least seven such calls from Defendant to Plaintiff.  The merits of the issues of which Defendant wants applied to the case at bar, have already been defined by Courts, by the FCC, and by Congress.

Congress, in drafting and passing the TCPA, made it unlawful "to make any call (other than a call made for emergency purposes or made <u>with the prior express consent of the called party</u>) using any automatic telephone dialing system or an artificial or prerecorded voice…to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call."  47 U.S.C. § 227(b)(1)(A) (emphasis added).

**"Automatic Telephone Dialing System" Has Been Consistently Defined Throughout the U.S. by Courts and the FCC for Years**

Plaintiff's Petition alleges that Defendant placed calls to him with an automatic telephone dialing system ("ATDS").  The issue of what constitutes an ATDS, which clearly includes "predictive" dialers, has long been settled by the FCC.  The FCC addressed its role in interpreting the TCPA and, more specifically, the definition of an ATDS in a 2003 ruling. *See In the Matters & Regulations*

*Implementing the Telephone Consumer Protection Act of 1991*, FCC LEXIS 3673, 18 F.C.C.R. 14014 (Fed. Commc'n Cmm'n July 3, 2003).

To evolve the TCPA in a technologically future-conscious manner, the FCC's 2003 ruling applied the TCPA to predictive dialing systems, *regardless* of whether they are currently using a random or sequential number generator. *Id.* (emphasis added). The FCC found that because purchasing lists of numbers had become more efficient for companies, the use of lists with an autodialer that does not require human intervention is within the definition of an ATDS. The FCC put special emphasis on following the intent of Congress. According to the FCC, Congress was "attempting to alleviate a particular problem—an increasing number of automated and prerecorded calls to certain categories of numbers." *Id.* Because autodialers "can dial thousands of numbers in a short period of time, calls to these specified categories of numbers are particularly troublesome." *Id.*

Congress' concern was not with the specific mechanism that the autodialer loads numbers onto its queue, but rather with the end result of thousands of consumers being autodialed by a system without human intervention. *See Id.* The FCC continued to say that "to exclude from [TCPA] restrictions equipment that uses predictive dialing software from the definition of an [ATDS] … would lead to an unintended result." *Id.* The FCC construed the purpose of the requirement that "the capacity to store *or* produce telephone numbers to be called" was to "ensure the prohibition on autodialed calls not to be circumvented." *Id.* (emphasis added).

In what can be classified as companies' persistent tactic to constantly challenge the FCC's ATDS doctrine, the FCC issued a second ruling reiterating that predictive dialers *are within* the definition of an ATDS. 2008 Ruling at ¶ 12 ("We affirm that a predictive dialer constitutes an automatic telephone dialing system …") (emphasis added). In its 2008 Ruling, the FCC found that ACA, the petitioner in the 2008 Ruling, "raise[d] no new information about predictive dialing that warrants reconsideration …" *Id.* at ¶ 14.

The FCC has offered its technical expertise: that predictive dialers *are in fact* ATDSs. Whether a predictive dialer is an ATDS is an issue that has been reviewed and ruled on by the FCC on two separate occasions. *See Id.* and 2008 Ruling; *See Lardner v. Diversified Consultants, Inc.,* 17 F. Supp. 3d 1215 (S.D. Fla. 2014); *Meyer v. Portfolio Recovery Assocs., LLC,* 707 F. 3d 1036, 1043 (9th Cir. 2012); *Swope v. Credit Mgmt., LP,* 2013 WL 607830, at *4 (E.D. Mo. Feb. 19, 2013) (The FCC has twice "held that predictive dialers are considered automatic telephone dialing systems subject to the TCPA, and that debt collectors are not exempt from the statute's prohibitions."); *Vance v. Bureau of Collection Recovery, LLC*, 2011 WL 881550, at *2 (N.D. Ill. Mar. 11, 2011) ("[T]he FCC has indicated, and other courts have held, that predictive dialing systems do meet the definition of devices prohibited by the TCPA").

Courts have uniformly decided that predictive dialers are ATDSs, regardless of whether the system has the current capacity to store, produce, and/or dial telephone numbers. *See, e.g., Meyer,* 707 F. 3d at 1043 (2012) cert. denied,

133 S. Ct. 2361, 185 L. Ed. 2d 1068 (U.S. 2013) ([Defendant's] predictive dialers fall squarely within the FCC's definition of 'automatic telephone dialing system.'); *Jamison*, 290 F.R.D. 92, 97 (N.D. Ill. 2013) reconsideration denied, 12 C 4415, 2013 WL 3872171 (N.D. Ill. July 29, 2013) ("[A] predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers."); *Chavez v. Advantage Grp.*, 959 F. Supp. 2d 1279, 1281 (D. Colo. 2013) ("[The] Federal Communications Commission specifically has found [predictive dialers] to come within the scope of the TCPA."); ("The FCC ruled predictive dialers used by debt collectors fall within the meaning of autodialers…"); *Hickey v. Voxernet LLC*, 887 F. Supp. 2d 1125, 1129 (W.D. Wash. 2012) ("A predictive dialer is considered an ATDS under the TCPA."); *Tovar v. Midland Credit Mgmt.*, 2011 U.S. Dist. LEXIS 40103, at *13 (S.D. Cal. 2011) ("the FCC has already determined the TCPA applies to debt collectors and the definition of 'automatic telephone dialing system' includes 'predictive dialers').

In a recent Order Denying Motion for Partial Reconsideration of Order Denying Defendant's Motion for Summary Judgment, the court in *Sherman v. Yahoo! Inc.,* 2014 U.S. Dist. LEXIS 91164 (S.D. Cal. July 3, 2014) premised the Court's interpretation of what constitutes an ATDS on that of the *Satterfield* court. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. Cal. 2009). In *Satterfield*, the Ninth Circuit found that when courts determine what constitutes an ATDS under the TCPA, "the statute's clear language mandates that the focus

must be on whether the equipment has the *capacity* to store or produce telephone numbers to be called, using a random or sequential number generator" 569 F.3d at 951. (emphasis in original). The *Satterfield* court found that the statutory language was "clear and unambiguous" in the context of finding that the statute focused on equipment's requisite capacity rather than present functionality. *Id*. Although Yahoo! argued that subsequent case law made clear that the "mere ability to write or install new software does not, as a matter of law" make a dialer system, the court noted that the defendant's new proffered authority did not qualify as an "intervening change in the controlling law" sufficient to justify reconsideration. 2014 U.S. Dist. LEXIS 91164. The court found that decisions in *Satterfield* and *Meyer* were controlling in the Ninth Circuit, both of which concluded that a predictive dialer need not have the present capacity to store or produce numbers using a random or sequential number generator.

This aspect- the precise definition of "ATDS"- with regard to Defendant's Motion for Summary Judgment appears to be another desperate attempt to avoid liability for violating the TCPA. As just described, this issue has already been adjudicated extensively.

Defendant does not explicitly address how this definitional aspect would even impact the case at hand. Rather, Defendant seems to intimate that the "capacity" aspect of the FCC's definition of ATDS somehow meaningfully affects the merits of this case. Given the aforementioned points, one can presume that Defendant intends to draw a distinction between a predictive dialer and an ATDS.

As just discussed, this issue has already been adjudicated extensively: the courts and FCC have already clearly determined that current capacity is unnecessary and that a predictive dialer does constitute an ATDS.

Further, Plaintiff's Petition pleads that there were pauses of several seconds during the relevant calls before an actual human began speaking, which is a telltale sign of an ATDS.[4] We know that Defendant is registered and permitted to use Automatic Dial Announcing Device ("ADAD") in Texas, where such registration is a requirement. Put simply, there is absolutely no reason to believe that Plaintiff was contacted by equipment that would not be considered an "ATDS" for the purposes of the TCPA.

Autodialing consumers in mass fashion without having prior express consent is a classic example of the type of unwanted activity expressly envisioned by Congress when passing the TCPA. *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 742-46 (2012). The Supreme Court has noted that such practices are an "intrusive nuisance" and an "invasion of privacy." *Id*.

### Spokeo, Inc. v. Robins

On May 16, 2016, the Supreme Court issued its opinion. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016). Plaintiff suffered the type of concrete harms required for Article III standing. Plaintiff was harmed because the calls at issue

---

[4]    "20.    Plaintiff answered Defendant's calls. However, when Plaintiff answered the call, he was often greeted with "dead air" whereby no person was on the other line. Sometimes, after several seconds, a live person would be connected to the automated call to greet Plaintiff and discuss the alleged debt." *See* Plaintiff's Petition for Damages.

were an invasion of privacy, an intrusion onto his cellular telephone line, a nuisance, and a waste of time. These are the exact harms that Congress sought to prevent in enacting the TCPA. *See* Pub. L. 102-243, § 2, 105 Stat. 2394 (1991). As explained below, the *Spokeo* decision does not affect Plaintiff's standing to pursue this action.

Count Three of Plaintiff's suit arises under the TCPA, 47 U.S.C. § 227, a federal statute enacted in response to widespread public outrage over the proliferation of intrusive, nuisance telemarketing practices. *See Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012). "Month after month, unwanted robocalls and texts, both telemarketing and informational, top the list of consumer complaints received by the [Federal Communications] Commission." *See In re Rules & Regulations Implementing the [TCPA] of 1991*, 30 F.C.C.R. 7961, 7964, ¶ 1 (July 15, 2015). The TCPA is designed to protect consumer privacy by, among other things, prohibiting the making of autodialed voice calls to cellular telephones, prerecorded voice calls to cellular or residential telephone numbers, and calls to telephone numbers registered with the national Do Not Call Registry. *See* 47 U.S.C. § 227(b)(1); 47 C.F.R. § 64.1200(c)(2).

**Standing After *Spokeo*.**

In *Spokeo,* the Supreme Court addressed the injury-in-fact requirement for Article III standing. The Supreme Court's decision did not change the law of standing. Instead, the Supreme Court confirmed the long-established principle

that "standing consists of three elements." *Spokeo*, 136 S. Ct. at 1547 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* The Supreme Court further confirmed that to establish injury in fact—the element primarily at issue in *Spokeo*—a plaintiff must "allege an injury that is both 'concrete' *and* 'particularized.'" *Id.* at 1545 (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (emphasis added in *Spokeo*)).

According to the Supreme Court, a "particularized" injury "must affect that plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548. The Court agreed with the Ninth Circuit that the *Spokeo* plaintiff had suffered a particularized injury because he claimed that the defendant—an alleged credit-reporting agency—"violated *his* statutory rights," and his "interests in the handling of his credit information are *individualized rather than collective*." *Id.* (quoting *Robins v. Spokeo, Inc.*, 742 F.3d 409, 413 (9th Cir. 2014)) (emphasis in original).

Further, *Spokeo* confirmed that a "concrete" injury "must actually exist." *Id.* However, a "concrete" injury may be "intangible." *Id.* at 1549. *Spokeo* indicated two approaches for establishing that an intangible injury is "concrete." "In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." *Id.* First, courts should consider whether an alleged intangible harm "has a close relationship to a harm

31

that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* (citing *Vermont Agency of Nat'l Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 775–77 (2000)).  A plaintiff may therefore demonstrate that he suffered a concrete injury by showing that his injury is analogous to a harm traditionally recognized at common law.

Second, Congress may identify and "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate at law." *Id.* (citation and internal quotation marks omitted).  Congress "has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before" because Congress "is well positioned to identify intangible harms that meet minimum Article III requirements." *Id.*

The Court noted that merely asserting a "bare procedural violation, divorced from any concrete harm," will not satisfy the concreteness requirement. *Id.*  However, this observation has little application to TCPA claims.  Such claims are not based on "bare procedural violations," but rather on substantive statutory prohibitions on certain actions that cause harm to call recipients.  Even for procedural rights, a "risk of real harm" can satisfy Article III. *Id.*  The Court stated:  "[T]he violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact.  In other words, a plaintiff in such a case need not allege any *additional* harm beyond the one Congress has identified." *Id.* (emphasis in original).

In *Spokeo*, the defense bar sought a ruling that would have changed the law and eviscerated causes of action seeking statutory damages. But the Supreme Court did no such thing. Instead, it issued a narrow ruling remanding the case to the Ninth Circuit solely on the basis that it had failed to address the extent to which Robins' injuries were "concrete" as opposed to merely "particularized." *Id.* at 1545. The Supreme Court explicitly took no position on whether Robins' injuries were in fact concrete for standing purposes. *Id.* at 1550. *Spokeo* thus creates no new law. As Justice Alito noted, "[w]e have made it clear time and time again that an injury in fact must be both concrete *and* particularized." *Id.* at 1548 (emphasis in original).

**Plaintiff Suffered Harms Sufficient to Satisfy Article III Standing After *Spokeo*.**

Plaintiff suffered "particularized" injuries that are also "concrete." Thus, Plaintiff has satisfied the "injury in fact" requirement for Article III standing.

1.    Plaintiff suffered "particularized" injuries.

*Spokeo* confirmed that injury in fact must be "particularized" in that it "must affect the plaintiff in a personal and individual way." 136 S. Ct. at 1548. In other words, standing requires that the plaintiff "has suffered some actual or threatened injury." *Valley Forge Christian College v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982). Here, Defendant placed calls to Plaintiff's cellular telephone in violation of the TCPA. The unlawful debt collection auto-dialed calls that caused harm were received by Plaintiff, a member

of the National and Kansas No Call List(s) and, as a result, <u>Plaintiff</u> suffered those resulting harms. Because Plaintiff suffered such harms individually, the injury is particularized.

2.  Plaintiff suffered a "concrete" injury.

In *Spokeo*, the Supreme Court provided courts with several tools to use in determining whether a plaintiff's alleged intangible harm is "concrete." *See* 136 S. Ct. at 1549. First, courts may look to common law to determine whether an alleged intangible harm "has a close relationship to a harm that has been traditionally regarded as providing a basis for a lawsuit." *Id.* Second, courts may look to the legislative intent of the statute at issue in the case to determine whether Congress identified the injury it sought to prevent by enacting the statute. *Id.* (observing "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before") (quoting *Lujan*, 504 U.S. at 578, Kennedy, J. concurring).

Here, Plaintiff has suffered concrete harm under either approach. Plaintiff has suffered harm in the form of invasion of privacy, intrusion upon his cellular telephone line, waste of time, and nuisance, particularly as a member of the a member of the National and Kansas No Call List(s). Each of these intangible harms has a "close relationship" to a harm traditionally recognized at common law. Further, the legislative history of the TCPA demonstrates that Congress sought to "elevate to the status of legally cognizable injuries" the privacy and

nuisance harms that the TCPA seeks to prevent. As a result, these harms are sufficient to confer standing under *Spokeo*.

a.   *The invasion of privacy caused by the unlawful calls gives Plaintiff Article III standing.*

The first type of harm Plaintiff suffered is invasion of his privacy right(s). Invasion of privacy is an intangible harm that is recognized by the common law. American courts have long recognized that "[o]ne who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other." Restatement (Second) Torts § 652A (1977). Nearly every state currently recognizes invasion of privacy in its tort law. *See* Eli A. Meltz, *No Harm, No Foul?  Attempted Invasion of Privacy and the Tort of Intrusion Upon Seclusion*, 83 Fordham L. Rev. 3431, 3440 (May 2015) (concluding after state survey that "[c]urrently, the vast majority of states recognize the intrusion strand of invasion of privacy either under common law or by statute"). The right to privacy is also protected under the Constitution. *See, e.g.*, *Lawrence v. Texas*, 539 U.S. 558 (2003); *Eisenstadt v. Baird*, 405 U.S. 438 (1972).

Courts have recognized that the interests protected by the TCPA are encompassed by the term "right to privacy." *See Owens Ins. Co. v. European Auto Works, Inc.*, 695 F.3d 814, 819-20 (8th Cir. 2012) ("[T]he ordinary meaning of the term 'right of privacy' easily includes violations of the type of privacy interest protected by the TCPA."); *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 377 (4th Cir. 2013) (recognizing that the TCPA "protects residential privacy"). In

addition, courts have recognized direct application of common law invasion of privacy claims to unwanted telephone calls. *See, e.g.*, *Charvat v. NMP, L.L.C.*, 656 F.3d 440, 452–453 (6th Cir. 2011) (Ohio law) (repeated telemarketing calls may be invasion of privacy); *St. Paul Fire & Marine Ins. Co. v. Green Tree Fin. Corp.*, 249 F.3d 389, 394 (5th Cir. 2001) (Tex. law) (finding that repeated telephone calls support a claim for invasion of privacy). Indeed, the TCPA can be seen as merely liberalizing and codifying the application of this common law tort to particularly intrusive types of unwanted telephone calls. While the common law tort may require different elements than the TCPA, the Supreme Court's focus in *Spokeo* was not on the elements of the cause of action, but rather on whether the harm was of a type that traditionally provides a basis for a common law claim. Invasion of privacy is such a harm.

In addition to satisfying *Spokeo*'s concrete injury requirement because of a close relationship to a recognized common law harm, the harm resulting from the invasion of privacy caused by unwanted telephone calls was explicitly recognized by Congress as a harm the TCPA sought to prevent. In enacting the TCPA, Congress repeatedly referenced its purpose to protect consumers' privacy rights. The Congressional findings accompanying the TCPA stress the purpose of protecting consumers' privacy:

> (5) Unrestricted telemarketing, however, can be an *intrusive invasion of privacy* and, when an emergency or medical assistance telephone line is seized, a risk to public safety.

(6) Many consumers are outraged over the proliferation of *intrusive, nuisance calls* to their homes from telemarketers.

\*\*\*

(9) Individuals' *privacy rights*, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that *protects the privacy of individuals* and permits legitimate telemarketing practices.

(10) Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a *nuisance and an invasion of privacy*.

\*\*\*

(12) Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this *nuisance and privacy invasion*.

(13) While the evidence presented to the Congress indicates that automated or prerecorded calls are *a nuisance and an invasion of privacy*, regardless of the type of call, the Federal Communications Commission should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy, or for noncommercial calls, consistent with the free speech protections embodied in the First Amendment of the Constitution.

(14) Businesses also have complained to the Congress and the Federal Communications Commission that automated or prerecorded telephone calls *are a nuisance, are an invasion of privacy*, and interfere with interstate commerce.

Pub. L. 102-243, § 2, 105 Stat. 2394 (1991) (emphasis added); *see also In re Rules & Regulations Implementing the [TCPA] of 1991*, 30 F.C.C.R. 7961, 7967, ¶ 4 (July 15, 2015) ("Congress enacted the TCPA in 1991 to address certain practices thought to be an invasion of consumer privacy and a risk to public safety."); *Mims*

*v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012) (observing the TCPA "bans certain practices invasive of privacy"). And the Act's sponsor, Senator Hollings, stated that "[c]omputerized calls are the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall." 137 Cong. Rec. 30,821–22 (1991).

Plaintiff suffered an invasion of his privacy right(s) with each unlawful debt collection telephone call placed to his cellular telephone in violation of the TCPA. Plaintiff alleges that he received autodialed calls, received calls that played a prerecorded message, and received calls despite listing his telephone number on the National Do Not Call Registry. The FCC has explained that "[i]t is clear that automated telephone calls that deliver an artificial or prerecorded voice message are more of a *nuisance* and a greater *invasion of privacy* than calls placed by 'live' persons." *See In re Rules & Regulations Implementing the [TCPA] of 1991*, 7 F.C.C.R. 2736, 2740, ¶ 25 (April 17, 1992) (emphasis added). Further, placing calls to individuals who placed their telephone numbers on the national Do Not Call Registry constitutes an invasion of these consumers' explicitly requested privacy. Because the invasion of privacy harm caused by these calls is both traditionally recognized at common law and is the very harm that Congress sought to prevent in enacting the TCPA, Plaintiff easily satisfies the concrete injury requirement for Article III standing as articulated in *Spokeo*.

b.　　*The intrusion upon and occupation of Plaintiff's cellular telephone line caused by the unlawful calls give Plaintiff Article III standing.*

The second type of harm Plaintiff suffered is intrusion upon and occupation of his cellular telephone line.  The harm recognized by the ancient common law claim of trespass and, more specifically, trespass to chattels—the intentional dispossession of chattel, or the use of or intermeddling with a chattel that is in the possession of another—is a close analog for the harm caused by the unlawful telephone calls Plaintiff received. *See* Restatement (Second) of Torts § 217 (1965). Common-law courts recognized an action for trespass to chattels for temporary dispossession of personal objects "although there has been no impairment of the condition, quality, or value of the chattel, and no other harm to any interest of the possessor," and "he is not deprived of the use of the chattel for any substantial length of time." Restatement (Second) of Torts § 218 cmt. D (1965).  This is similar to the more widely familiar concept of trespass, which requires nothing more than "plac[ing a] foot on another's property" to constitute harm and thus confer standing on the property owner to bring a trespass claim. *Spokeo*, 136 S. Ct. at 1551 (Thomas, J., concurring).

The harm caused by unwanted telephone calls has a close relationship to the harm recognized by this ancient common law tort—a tort that protects fundamental property rights.  The TCPA can be viewed as merely applying this common law tort to a 21st-century form of personal property (a cellular or residential telephone line) and a 21st-century method of intrusion (complete

occupation of that telephone line through unlawful methods). Analogizing this common law harm to telephone calls and making redress for intrusive calls more readily available is particularly appropriate since electronic intrusion is so much easier, and so much more readily repeated, than physical dispossession or misuse of a chattel.

Multiple courts have held that temporary electronic intrusion upon another person's electronic equipment constitutes trespass to chattels. *See, e.g.*, *Register.com, Inc. v. Verio, Inc.*, 126 F. Supp. 2d 238, 249 (S.D.N.Y. 2000) (finding that intruding electronically into business's database causes harm by reducing the system's capacity and that "mere possessory interference is sufficient to demonstrate the quantum of harm necessary to establish a claim for trespass to chattels"), *aff'd* 356 F.3d 393 (2d Cir. 2004); *Am. Online, Inc. v. IMS*, 24 F. Supp. 2d 548, 550-51 (E.D. Va. 1998) (granting summary judgment against spammer on trespass to chattels claim because the plaintiff's "possessory interest in its computer network ha[s] been diminished by the bulk e-mailing"); *CompuServe, Inc. v. CyberPromotions, Inc.*, 962 F. Supp. 1015, 1022 (S.D. Ohio 1997) (issuing preliminary injunction against spammer on theory of trespass to chattels); *Microsoft Corp. v. Does 1–18*, 2014 WL 1338677, at *9–10 (E.D. Va. Apr. 2, 2014) ("The unauthorized intrusion into an individual's computer system through … unwanted communications supports [a claim for trespass to chattels]."). Courts have also found this tort theory applicable to unwanted telephone calls. *Czech v. Wall St. on Demand*, 674 F. Supp. 2d 1102, 1122 (D. Minn. 2009) (declining to

dismiss cell phone owner's trespass to chattels claim against sender of unwanted text messages); *Amos Fin., L.L.C. v. H & B & T Corp.*, 2015 WL 3953325, at *8 (N.Y. Sup. Ct. June 29, 2015) (occupying memory of answering machine and interfering with unencumbered access to phone would have been trespass to chattels if proven).

Not only is the harm associated with tying up a telephone line analogous to the tort of trespass to chattels, such harm is recognized in the legislative history of the TCPA. *See* H.R. Rep. 102-317 at 10 (1991) ("Once a phone connection is made, automatic dialing systems can 'seize' a recipient's telephone line and not release it until the prerecorded message is played, even when the called party hangs up. This capability makes these systems not only intrusive, but, in an emergency, potentially dangerous."). Further, courts have recognized that one purpose of the TCPA is to "keep[] telephone lines from being tied up." *Am. States Ins. Co. v. Capital Assocs.*, 392 F.3d 939, 942 (7th Cir. 2004). And the Eleventh Circuit has recognized that "the occupation of the recipient's telephone line and fax machine" is a sufficient injury-in-fact for a TCPA claim asserting violations of the statute's junk fax provisions. *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1250–1251 (11th Cir. 2015).

Plaintiff here suffered harms analogous to the interference with property recognized in the common law claim for trespass to chattels. During the calls, Plaintiff's phone line was tied up by Defendant's repeated unlawful collection calls. Until the calls were terminated, Defendant completely controlled Plaintiff's

cellular telephone line. Plaintiff could not place outgoing calls or receive other incoming calls due to Defendant's interference with his possessory interest in his telephone lines. As a result, Plaintiff a suffered concrete harm of a type traditionally recognized at common law and recognized by Congress and courts as a harm the TCPA sought to address. Plaintiff therefore has standing to pursue his TCPA claims.

c.   *The nuisance, interruption, and waste of time caused by the unlawful calls give Plaintiff Article III standing.*

Plaintiff also suffered a third type of intangible injury in the form of nuisance, interruption, and waste of time. Answering autodialed debt collection calls meant for someone else is wasteful of the precious resource of time and constitutes a nuisance. The first post-*Spokeo* decision to address whether a mere allegation of a TCPA violation satisfies Article III's requirement of "injury in fact" holds that wasting the recipient's time is a concrete injury that satisfies Article III:

> Here, the court is satisfied that Plaintiffs' allegations demonstrate "concrete injury" as elucidated in *Spokeo*. In *Spokeo*, the "injury" Plaintiffs incurred was arguably merely procedural and thus non-concrete. In contrast, the TCPA… violations alleged here, if proven, required Plaintiffs to waste time answering or otherwise addressing widespread robocalls. The use of the autodialer, which allegedly enabled Defendants to make massive amounts of calls at low cost and in a short period of time, amplifies the severity of this injury. As Congress and Washington State's legislature agreed, such an injury is sufficiently concrete to confer standing.

*Booth v. Appstack, Inc.*, No. C13-1533JLR, 2016 WL 3030256, at *5 (W.D. Wash. May 25, 2016). This decision is consistent with pre-*Spokeo* decisions recognizing

that lost time is an injury-in-fact in TCPA and other cases. *See Leung v. XPO Logistics, Inc*., --- F. Supp. 3d ----, No. 15 C 03877, 2015 WL 10433667, at \*4 (N.D. Ill. Dec. 9, 2015) ("Leung alleges that he lost time in responding to XPO's call. … That is enough, so XPO's motion [to dismiss TCPA claims] must be denied."); *Martin v. Leading Edge Recovery Solutions, LLC*, No. 11 C 5886, 2012 WL 3292838, at \*3 (N.D. Ill. Aug. 10, 2012) (finding plaintiffs suffered injury under TCPA in part "because they had to spend time tending to unwanted calls"); *Rex v. Chase Home Fin. LLC*, 905 F. Supp. 2d 1111, 1146 (C.D. Cal. 2012) ("[A] plaintiff suffers an injury sufficient to establish Article III standing where she alleges that she lost time spent responding to the defendant's wrongful conduct and the lost time is at least indirectly attributable to the defendant's actions.").

When it enacted the TCPA, Congress emphasized the nuisance aspect of automated calls, showing that it considered the interruptions they cause and the time they waste to be one of the harms the TCPA sought to remedy. As detailed above, Congress repeatedly identified such calls as a "nuisance." *See* Pub. L. 102-243, § 2, 105 Stat. 2394 (1991). Senator Hollings' colorful comments illustrate this harm: "They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed." 137 Cong. Rec. 30,821–22 (1991). Congress was also mindful of protecting consumers from the burdens of dealing with unwanted calls, finding that "[t]echnologies that might allow consumers to avoid receiving such calls ... place an inordinate burden on the consumer." Pub. L. 102–243, § 2, 105 Stat. 2394 (1991).

As a result of Defendant's calls, Plaintiff suffered the very nuisance, interruption, and waste of time harms that Congress identified and that courts have found sufficient to support Article III standing. Plaintiff's time was wasted in answering calls, listening to prerecorded messages, and/or speaking with representatives to repeatedly ask them to quit calling him about someone else's debt. The calls were a nuisance and interruption to the life of Plaintiff each time he was forced to attend to his ringing phone, request that he was not to be called further, or listen to and delete a voicemail message. As a result, Plaintiff suffered concrete harm sufficient to establish their standing to bring TCPA claims.

d.      *Plaintiff suffered tangible harms as a result of the use of his cellular telephone minutes to answer the calls.*

Finally, not only has Plaintiff suffered concrete but "intangible" harms, Plaintiff also sustained "tangible" economic harm as a direct result of Defendant's illegal autodialing collection practices. The calls at issue were received on a cell phone used by and paid for by Plaintiff. The FCC has long recognized that the recipient of telemarketing calls to a cell phone is monetarily "charged" for such calls, even if the recipient subscribes to a plan that charges a flat monthly rate for the plan. *See In re Rules & Regulations Implementing the [TCPA] of 1991,* 18 F.C.C.R. 14014, 14115, ¶ 165 (July 3, 2003); *In re Rules & Regulations Implementing the [TCPA] of 1991*, 23 F.C.C.R. 559, 562, ¶ 7 (Jan. 4, 2008); *In re Rules & Regulations Implementing the [TCPA] of 1991*, 27 F.C.C.R. 1830, 1839– 40, ¶ 25 (Feb. 15, 2012); *see also Lee v. Credit Mgmt., LP*, 846 F. Supp. 2d 716,

729 (S.D. Tex. 2012) ("Lee has stated that he pays a third-party provider for cellular phone services. Normally, this is sufficient to show that an individual was charged for the calls."); *Fini v. DISH Network L.L.C.*, 955 F. Supp. 2d 1288, 1297 (M.D. Fla. 2013). Because Plaintiff compensated his extended family that helps care for him for the monthly cell phone bills for the phone line on which he received the calls, Plaintiff has suffered a tangible injury in fact. *See Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 638 (7th Cir. 2012) (finding that consumers ultimately bear the costs of calls to cell phones regardless of "whether they pay in advance or after the minutes are used") (***emphasis supplied***). This tangible harm confers standing under *Spokeo*.

For the reasons detailed above, Plaintiff has Article III standing to bring the TCPA claims alleged. The calls Plaintiff received invaded his privacy, intruded on his cellular telephone line, and wasted his time. These harms establish that Plaintiff suffered "concrete" harm under *Spokeo*. As a result, the Court should deny Defendant's Motion for Summary Judgment.

WHEREFORE, Plaintiff respectfully requests this Court deny Defendant's Motion for Summary Judgment in its entirety, and for other and further such relief as this Court may deem appropriate.

Respectfully submitted,

*/s/ A. Scott Waddell*
A. Scott Waddell KS# 20955
Waddell Law Firm LLC
2600 Grand, Suite 580
Kansas City, Missouri 64108
Telephone: 816-914-5365
scott@aswlawfirm.com
**Attorney for Plaintiff**

## CERTIFICATE OF SERVICE

On July 22, 2016 the undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court via the CM/ECF system, which will send notice to all parties of record.

*/s/ A. Scott Waddell*
A. Scott Waddell KS# 20955
***Attorney for Plaintiff***